# United States District Court
## for the District of Puerto Rico

| | |
|---|---|
| PUMA ENERGY CARIBE, LLC,<br><br>Plaintiff.<br><br>v.<br><br>C-FUELS, LLC and its illegal assignee, TO GO STORES, INC.,<br><br>Defendants. | CIVIL NO. 15-2574<br><br>RE: TRADEMARK INFRINGEMENT; TRADEMARK DILUTION; TERMINATION UNDER PETROLEUM MARKETING PRACTICES ACT; INJUNCTION; DECLARATORY JUDGMENT; DISPOSSESSION; COLLECTION OF MONIES; AND DAMAGES |

## VERIFIED COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** plaintiff, **Puma Energy Caribe, LLC ("Puma")**, through the undersigned counsel, as and for its complaint against the defendants herein, respectfully states, alleges and prays as follows:

### I.    JURISDICTION AND VENUE

1.      This Honorable Court has original federal question jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1338, as this case involves substantial claims arising under the Lanham Act, 15 U.S.C. § 1051, *et seq.* and the Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125, *et seq.* It also has federal question jurisdiction over the claims arising under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.*, ("P.M.P.A.") and supplemental jurisdiction over the Puerto Rico law claims pursuant to 28 U.S.C. §1367(a).

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) and (c), given that defendants are citizens and are doing business in the Commonwealth of Puerto Rico and the claims alleged in this Complaint arose in this district.

## II. NATURE OF THE ACTION

3. This is a civil action for breach of a Franchise Agreement and termination pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. §2801 Et seq.; for trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and for trademark dilution in violation of the Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125 (a) and (c).

4. Puma also seeks a temporary restraining order, a preliminary injunction and a permanent injunction to enjoin defendants from continuing to illegally exhibit the Puma Trademarks at the gasoline service station number 007 located at Ave. De Diego & Carr. #21, Reparto Metropolitano, San Juan, Puerto Rico 00922 (the "Station"), because defendants' acts disparage, dilute, and otherwise damage the value of the Puma Trademarks since defendants were terminated as Puma dealers pursuant to the P.M.P.A. and are no longer authorized to use such marks or to operate the Station.

5. Puma seeks a temporary restraining order, a preliminary injunction and a permanent injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, instructing defendants to immediately surrender the leased premises since Puma validly terminated defendants as dealers pursuant to the P.M.P.A., and thus they have no right to retain possession over the Station.

6.     Puma also seeks declaratory relief, which may be granted under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and Rule 57 of the Federal Rules of Civil Procedure.

7.     Puma seeks to recover damages for breach of contract and loss of business or income from defendants in an amount not less than $100,000.00, plus interest, pursuant to Articles 1044, 1054, 1077 and 1206, *et seq.*, of the Puerto Rico Civil Code ("Code"), P.R. Laws Ann. tit. 31, §§ 2994, 3018, 3052, 3371 and other applicable laws.

8.     Puma seeks to judicially dispossess defendants of the premises where the Station is located pursuant to Article 1459 of the Code, P.R. Laws Ann. tit. 31, § 4066.

9.     Puma seeks to recover damages from defendants under Article 1802 of the Code, P.R. Laws Ann. tit. 31, § 5141.

10.    Puma also seeks to protect the environment and its absolute liability pursuant to Article 45 of the Code, Environmental Public Policy, P.R. Laws Ann. tit. 12, § 8004n.

### III.    THE PARTIES

11.    Plaintiff Puma Energy Caribe, LLC, is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico. Its principal place of business is in Guaynabo, Puerto Rico. Puma is the owner and has responsibility for protecting the Puma Marks. Puma Energy Caribe, LLC is duly authorized to use the trade name Puma, as well as the use of its other gasoline and petroleum related products' trademarks, and the use of the Puma Service Stations service marks and trade dress. Puma is the title owner of gasoline service station number 007 located at De Diego Ave. & Carr. #21, Reparto Metropolitano, San Juan, Puerto Rico 00922, ("Station").

12.     Plaintiff has been authorized to use the Puma Marks by the owner of the trademark "PUMA." Puma Energy International, S.A. Limited Liability Company Bahamas, the parent company of Puma Energy Caribe, LLC, is the owner of the trademark "PUMA" and the font and design marks for the Puma gasoline stations since 2005, and which have been registered in the United States Patent and Trademark Office under Serial No. 85889004. This filing is in full force and effect, unrevoked and uncanceled. A copy of the certificate for the mark is attached, and marked as **Exhibit 1.** Plaintiff has continuously engaged in the production, distribution and sale of petroleum related products under the business name of "PUMA" for over 4 years in Puerto Rico and since its registration in 2005. Puma has been authorized by its parent company the use and protection of the trademark "PUMA."

13.     Defendant C-Fuels, LLC, ("CF") is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico. C-Fuel, LLC's principal place of business is in San Juan, Puerto Rico and was authorized to operate as a retailer franchisee of Puma, gasoline service station number 007, the Station. Defendant is a "franchisee" as the term is defined by Article 101(4) of the P.M.P.A., 15 U.S.C. § 2801(4).

14.     Defendant To Go Stores, Inc. ("To Go") is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico with its principal place of business in Bayamon, Puerto Rico. To Go currently operates without authorization or permission from Puma the Station on behalf of CF for both the service station for the sale of petroleum products as well as a convenience store located at the Station. Pursuant to the franchise agreement, as described more fully below, only CF was permitted to operate the Station, not To Go. Further, CF was not

not authorized to sublease any portion of the Station without the written approval and authorization of Puma.

## IV. STATEMENT OF FACTS

### A. The Franchise Agreement

15. On May 1, 2013, defendant CF entered into a "Contrato de Franquicia Para Facilidades de Estación de Gasolina y Suministro", Franchise Agreement, ("Franchise Agreement") with Puma for the use of certain real property located at Ave. De Diego & Carr. #21, Reparto Metropolitano, San Juan, Puerto Rico 00922 in order to operate a gasoline service station and convenience store. [**Exhibit 2, Franchise Agreement with translation**]. The real property also contains a large parking lot, which is separated from the rest of the Station by a fence and gate. Puma is the owner of the aforementioned real property.

16. The Franchise Agreement was for a term of thirty-six (36) months starting on May 1, 2013, and ending on April 30, 2016. [**Exhibit 2 at section 2.1.1**].

17. The Franchise Agreement expressly provides that the operation of a gasoline service station, convenience store and all associated services was the main consideration at the moment of entering into such agreement. [**Exhibit 2 at pg. 1 and Section 4.2.3**].

18. The Franchise Agreement also provides that defendant CF, as retailer, expressly recognized that at the moment the agreement was entered into, the property was fully equipped and qualified to be used as a gasoline service station and convenience store. [**Exhibit 2 at Article I and Article VII, Subsection 7.7.5.III.**].

19. Defendant CF recognized that all structures, facilities and certain additional equipment used for the operation of the gasoline service station that are located at said premises are property of Puma. **[Exhibit 2 at 6.1.16]**.

20. The Franchise Agreement provides that defendant CF would pay Puma a monthly fee of fourteen thousand two hundred four dollars and 00/100 U.S. Dollars ($14,204.00) for the use of the aforementioned real estate during the term of the Franchise Agreement. **[Exhibit 2 at 3.1.1]**. This monthly fee was amended by agreement decreasing the monthly rental amount to ten thousand six hundred fifty-three and 00/100 U.S. Dollars ($10,653.00). **[Exhibit 3, Adjustment of Rent with translation]**.

21. The Franchise Agreement provides that defendant CF will pay each delivery of Puma petroleum products via direct debit, electronic transfer of funds or any other acceptable form of payment approved by Puma, including direct deposit. **[Exhibit 2 at 3.2.2 and 3.2.3.]**.

22. The Franchise Agreement provides that defendant CF would use the property as a gasoline service station in order to sell Puma branded petroleum products, merchandise and services normally rendered in Puma's gasoline, convenience and service stations. **[Exhibit 2 at 7.2.1]**.

23. The Franchise Agreement provides that defendant CF would be responsible for repairs and maintenance costs related to equipment and property as indicated. **[Exhibit 2 at 7.7.5]**.

24. The Franchise Agreement provides that in the event that defendant CF failed to comply with any of its duties under such agreement, Puma is entitled to terminate the same. **[Exhibit 2 at 16.1.1]**.

25.     The Franchise Agreement provides that Puma's prior written consent is necessary in order to perform any alterations, modifications, removal, changes, improvements, additions, or replacements to any structure and/or equipment located at the Station. **[Exhibit 2 at 7.7.4]**.

26.     The Franchise Agreement authorizes the termination of said agreement under the following circumstances, among others: the occurrence of an event which constitutes a breach of contract **[Exhibit 2 at 16.1.1(U)]**; if the retailer assigns or transfers the Station to a third party **[Exhibit 2 at 16.1.1(Q)]**; if the retailer fails to make his best effort to comply with the provisions of such agreement **[Exhibit 2 at Page 1 and at 16.1.1(U)]**; in the event the retailer violates the aforementioned trademarks **[Exhibit 2 at Section 7.4 and 16.1.1(U)]**; or for any termination grounds available under applicable law **[Exhibit 2 at 16.1.1(V)]**.

27.     The Franchise Agreement clearly states that it is nontransferable either by Puma or CF and further states that CF agreed not to assign or transfer its interest in the Station. **[Exhibit 2 at 14.1.1, 14.1.2 and 14.1.3]**.

28.     Should CF wish to sublease or subcontract *any* part of the Station, CF agreed that it must first contact Puma and obtain its permission to do so. **[Exhibit 2 at 14.1.4]**.

29.     The retailer does not have authorization to use the premises for the warehousing of motor vehicles or trucks under the Franchise Agreement. **[Exhibit 2 at 7.2.3]**.

**B.      Supply of Petroleum Products under the Franchise Agreement**

30.     The Franchise Agreement grants the right to buy and resell Puma branded petroleum products and to operate the Station under such trademark. **[Exhibit 2, Article 6, Generally]**.

31.    The Supply Agreement provides that defendant/retailer CF would only use the marks, registered marks, trademarks, names and/or service distinctions that Puma may authorize the retailer to use as part of the operation of the Station. **[Exhibit 2 at 6.1.2 and 6.1.22]**.

32.    The Franchise Agreement provides that defendant/retailer CF would comply with any and all applicable environmental laws and regulations. **[Exhibit 2 at 4.1.9 and 7.6.1]**. These contract provisions are designed to facilitate Puma's compliance with applicable federal and state environmental laws, rules and regulations, which require compliance with strict monitoring and record keeping programs. Id.

33.    The Franchise Agreement provides that in the event defendant/retailer CF failed to comply with any of its duties under such agreement, Puma is entitled to suspend the delivery of petroleum products and terminate the agreement. **[Exhibit 2 at 16.1.1(U)]**.

C.    **Commodatum-Like Provisions of the Franchise Agreement**

34.    The Franchise Agreement grants defendant CF the right to use, akin to that the legal figure known as commodatum, the underground storage tanks ("USTs") and other equipment for the storage and sale of petroleum products located and/or installed at the Station, which is owned by Puma. **[Exhibit 2 at 7.7.5.III and at Schedule B describing Inventory at Station]**.

35.    The Franchise Agreement incorporates an express recognition by defendant CF to the effect that the underground storage tanks and the equipment for the storage and sale of petroleum products located at the Station are property of Puma. Defendant CF also recognized that all the structures, facilities and certain additional equipment, such as the gasoline pumps, tanks, electrical, office equipment, and others used for the operation of the gasoline service

station that are located at the Station are property of Puma. **[Exhibit 2 at 7.7.5.III and at Schedule B describing Inventory at Station].**

36.     The Franchise Agreement expressly states that the equipment for the storage and sale of petroleum products, and all other equipment, could only be used for the storage and sale of petroleum products under the Puma Marks. **[Exhibit 2 at 7.7.3].**

37.     The Franchise Agreement provides that defendant CF has a duty to perform tests on a daily basis in order to verify that there has been no loss of product, aside from normal evaporation, and to detect any leaks in the tanks. Defendant has a duty to keep records of such tests and inspections, and to allow the inspection of such records at any time by Puma and/or any government entity. **[Exhibit 2 at 7.8.4 and Schedule D at Section 4].**

38.     The aforementioned contract provisions are designed to facilitate Puma's compliance with applicable federal and state environmental laws, rules and regulations, which require compliance with a strict monitoring and record keeping programs. **[Id. and Section 7.6].**

39.     The Franchise Agreement also provides that defendant CF may not remove, eliminate or relocate the equipment from the places where they are located and/or installed at the Station without the prior written authorization of Puma, which will be given at Puma's absolute discretion. **[Exhibit 2 at 8.1.4, 8.2.1 and 8.2.2].**

40.     The Lease Agreement provides that, in the event of a termination, Puma would be entitled to repossess the aforementioned equipment. **[Exhibit 2 at 16.3.3].**

D.     **Further Description of the Station's Premises**

41.     The Station includes the equipment listed above, but also contains a large parking facility (the "Lot"). The Lot is physically separated from the remainder of the Station by a fence and a gate, which is only accessible for those holding a pass to enter. **[Exhibit 4, plot plan of the Station and Lot].**

42.     When acquiring the Station from its previous owner, CAPECO, Puma was advised that the franchisee of the Station controlled the Lot and could be permitted to sublease the Lot to a third party, at Puma's discretion.

43.     Currently, a third party named Suiza Dairy Corporation ("Suiza Dairy") subleases the Lot. Puma was able to obtain copy of the lease, which it includes as an exhibit to this Verified Complaint. **[Exhibit 5, Lease between To Go and Suiza Dairy].**

44.     In addition to the parking spaces in the Lot, there are seventeen (17) additional spaces at the Station which abut the service station and convenience store. These spaces are meant to be reserved for customers of the Station and are not part of the Lot.

**D.     Events of Default Leading to the Termination.**

45.     Since becoming a franchisee of Puma, defendant CF has repeatedly breached its essential obligations under the Franchise Agreement.

46.     The Franchise Agreement is solely between Puma and CF. No other parties are permitted to operate the Station.

47.     Puma never recognized To Go as having anything to do with the Station. In fact on May 11, 2015, Brenda Ramos from Puma's Credit and Collec6tion Department wrote to Mr.

Nelson Capote indicating that Puma could not accept the products' surety bond in the name of To Go Stores, Inc., and that the name had to be changed to the actual retailer: C-Fuels.

48.     Similarly, on September 18, 2015, Puma returned a check payable to Puma to Maria Flores Fuentes from To Go because the payor was To Go Stores. The check was not registered in Puma's records and it was returned to them.

49.     Contrary to the terms and conditions the franchise agreement, CF has, unilaterally, without authority, permission and without informing Puma, *de facto* transferred its interest in the Franchise Agreement and control of the Station to a third party, To Go.

50.     To Go owns a chain of small convenience stores with locations throughout Puerto Rico. The owners of To Go have interest in a competing petroleum business, Toral Corporation ("Toral"), which has stations throughout Puerto Rico. Until recently, To Go advertised that it was solely part of Toral. **[Exhibit 6, picture of former To Go website]**. The website now displays Puma's Marks, despite the termination of the Franchise Agreement with CF, which was never authorized to allow any third party to display the Puma Marks to begin with. **[Exhibit 7, pictures of current To Go website]**.

51.     To Go has never received any authorization, written or otherwise, for the use, display or market the Puma Marks, which they continue to show as part of their advertising and marketing in their website giving the wrong impression that Puma has any kind of agreement with To go, or that it endorses its convenience stores and products. To go is infringing and diluting the Puma Marks.

52.     The business operating licenses for the Station, including the convenience store and the service station for the sale of petroleum products, are held by To Go, not CF. **[Exhibit 8, pictures of business licenses for the Station]**.

53.     The uniforms worn by all employees inside by the service station and convenience store are To Go uniforms, not Puma.

54.     Additionally, Suiza Dairy subleased the Lot from To Go, a party that has no privity or interest in the premises. The sublease agreement does not mention CF, which is the party actually having an interest in the Lot, and is not a party to the sublease.

55.     Pursuant to the Franchise Agreement, CF is the sole party responsible for the Station and may not transfer its interest in the Station to a third party. However, that is exactly what CF has done, by permitting To Go to operate and maintain the Station and sublease the Lot to Suiza Dairy without written authorization from Puma.

56.     In addition to *de facto* transferring its interest in the Franchise Agreement to To Go, CF agreed not to alter any part of the Station, including the pavement surrounding the convenience store and service station.

57.     In contravention to the franchise agreement, CF, through its illegal assignee To Go, installed permanent fixtures separating the seventeen parking spaces within the Station, depriving the Station of their use. These spaces are meant for customers of the Station and are not in any way part of the lease between To Go and Suiza Dairy. **[Exhibit 5 at paragraph A.]**.

58.     CF and To Go installed pipes between each parking space and installed signs stating that the seventeen parking spaces are solely for use by Suiza Dairy. [**Exhibit 9, May 20, 2015 Notary Certificate with pictures of parking spaces and signs at the Station**].

59.     In short, defendant CF has openly disregarded many obligations under the Franchise Agreement by transferring its interest in the Station to a third party and by permanently altering the pavement and parking spaces at the Station.

**E.     The Termination Notices**

60.     Given all the above mentioned material breaches of contracts and breaches of trust of the established franchise relationship, which came into Puma's knowledge on May 20, 2015, on June 12, 2015, counsel for Puma sent defendant CF a written notice stating that the franchise relationship between the parties was being terminated, effective in ninety (90) days due to its failure to abide by the Franchise Agreement.  At the time of this letter, Puma was aware only of CF's alternation of the parking spaces in violation of the aforementioned agreements between the parties and the P.M.P.A., 15 U.S.C. § 2802, *et seq.*  The termination notice included a "Summary Statement" prepared by the Secretary of Energy, as required by Article 104(c) (3) (C) of the P.M.P.A., 15 U.S.C. § 2804(c) (3) (C), and requested CF to turn over the Station to Puma. [**Exhibit 10, translation of Termination letter of June 12, 2015**].

61.     Counsel for CF responded by letter dated July 7, 2015, maintaining that CF has authority to alter to parking spaces and that such alteration in any event did not constitute a breach. [**Exhibit 11, translation of response of July 7, 2015**].

62.     On September 25, 2015, counsel for Puma sent CF's counsel a supplemental termination notice and notice of eviction to counsel for CF. On September 21, 2015, Puma learned of the *de facto* transfer and assignment of the Station from CF to To Go. CF was informed that such material breaches entitled it to immediate termination of the Franchise Agreement under applicable provisions of the P.M.P.A., 15 U.S.C. § 2802, *et seq.* The termination notice included a "Summary Statement" prepared by the Secretary of Energy, as required by Article 104(c)(3)(C) of the P.M.P.A., 15 U.S.C. § 2804(c)(3)(C), and requested defendants to turn over the Station to Puma within five days of the date of the letter. **[Exhibit 12, Supplemental Notice of September 25, 2015]**.

63.     Said supplemental notice was sent by certified mail. **[Exhibit 13, Returned Receipt]**.

64.     At the moment, CF, through its illegal assignee To Go, continues to retain possession over the Station and refuses to turn over possession of the Station to Puma. To Go continues to operate the gasoline station with the Puma Marks without authorization and have continued to operate a third party business, To Go, on the premises without authorization and after being directly instructed not to do so. To Go's website continues to display and advertise Puma marks without permission.

65.     Recently, To Go, not CF, published an ad seeking employees for the Station. **[Exhibit 14, employment advertisement]**.

**F.      Post-Termination Obligations**

-14-

66. Upon termination of the existing agreements, CF ceased to be an authorized Puma franchisee. Therefore, defendant CF had the obligation to surrender the Station and all equipment property of Puma in the same condition as it was received, and to discontinue his unauthorized use and exhibition of the Puma Marks.

### G.    Breach of Post-Termination Obligations

67. As of today, defendant CF has failed to comply with the abovementioned ongoing obligations of the terminated agreement, has retained possession of the Station through its illegal assignee, To Go, and has continued to illegally exhibit the Puma Marks. Defendant CF bluntly stated that it will not surrender the Property, and therefore Puma must seek eviction in order to repossess the site.

68. Furthermore, defendant CF's actions simply ignore contractual and legal obligations with Puma, and exposes Puma to potential liability under applicable environmental laws, rules and regulations, without allowing Puma to take any and all appropriate measures to supervise and ensure compliance with the same.

## V.    FIRST CLAIM FOR RELIEF
## VIOLATION OF THE LANHAM ACT AND
## TRADEMARK DILUTION REVISION ACT OF 2006

69. Paragraphs 1 to 68 are hereby incorporated by reference.

70. Defendant CF, through To Go as its illegal assignee, is using the Puma Marks; is representing itself to be a Puma franchisee despite its termination; and is advertising its business with the Puma Marks, among other unauthorized acts.

71. The use of the Puma Marks is causing confusion and/or mistake and is deceiving consumers as to the origin, the licensing, and the endorsing by Puma of the operation by operating as a Puma station despite termination of the franchise.

72. Defendants' aforesaid acts constitutes trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, *et seq.,* and the Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(a). Said acts tarnish and dilute the Puma Marks.

73. Defendants' aforesaid acts have caused Puma to suffer injury and damages of such a nature that monetary damages alone cannot adequately compensate Puma for the loss suffered.

74. Further, Defendant To Go never received any authorization, written or otherwise, for the use, display or market the Puma Marks in their website, which they continue to show as part of their advertising and marketing giving the wrong impression to the general public that Puma has any kind of agreement with To go, or that it endorses its convenience stores and products. To go is infringing and diluting the Puma Marks.

75. The aforesaid acts by defendants are greatly and irreparably damaging Puma and will continue to be greatly and irreparably damaging to Puma unless defendants are enjoined and compelled by this Honorable Court to return the Station to Puma, its owner, because Puma is without an adequate remedy at law.

## VI. SECOND CLAIM FOR RELIEF
### TRADEMARK INFRINGEMENT IN VIOLATION OF SECTION 43(a) OF THE LANHAM ACT AND THE TRADEMARK DILUTION REVISION ACT OF 206

76. Paragraphs 1 through 75 are hereby incorporated by reference.

77. Defendant CF, through To Go, continues to use the Puma Marks both at the Station and on the To Go website; continues to represent itself to be a Puma franchisee despite its termination; and continues to advertise its business with the Puma Marks, which as of October 19, 2015, the sale of Puma gasoline products is not available to consumers affecting not only the value of the Puma marks, but also Puma's goodwill.

78. Defendant To Go has never received any authorization, written or otherwise, for the use, display or market the Puma Marks, which they continue to show as part of their advertising and marketing in their website giving the wrong impression that Puma has any kind of agreement with To go, or that it endorses its convenience stores and products. To go is infringing and diluting the Puma Marks.

79. Defendants' aforesaid acts tend to represent falsely that defendants' services and products are legitimately approved by Puma, which constitutes a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1114, *et seq.*, and the Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(a).

80. The aforesaid acts by defendant are greatly and irreparably damaging Puma and will continue to be greatly and irreparably damaging to Puma unless enjoined by this Honorable Court because Puma is without an adequate remedy at law regarding the injury to its brand.

## VII. THIRD CLAIM FOR RELIEF
## VIOLATION OF THE TRADEMARK DILUTION REVISION ACT OF 2006

81. Paragraphs 1 to 80 are hereby incorporated by reference.

82.     Defendants CF, through To Go, is still exhibiting signs that have the logo that identifies a Puma Service Station, which are part of the Puma Marks, in a manner that is still clearly visible to the public, despite the fact that his Franchise Agreement has been terminated.

83.     By continuing to operate the Station with To Go uniforms and business licenses after termination of the Franchise Agreement and by altering the property surrounding the Station, CF and To Go have negatively depicted Puma's Marks.

84.     This depiction of the Station and the Puma Marks in such a negative way constitutes dilution, disparagement, tarnishment and diminishment of the Puma trademarks, service marks, and products lines—all proscribed by Section 43 (c) of the Lanham Act, 15 U.S.C. § 1114, *et seq.*, and the Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125 *et seq.*

85.     Defendants' acts have caused and will continue to cause dilution, disparagement, diminution, and other damage to the value of the goodwill represented by, and of the distinctiveness of the Puma Marks, in violation of Section 43 (c) of the Lanham Act, 15 U.S.C. § 1114, *et seq.*, and the Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125 *et seq.*

86.     Defendants' aforesaid acts constitute, therefore, a violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1114, *et seq.*, and the Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125 *et seq.*

87.     Defendants' aforesaid acts have caused Puma to suffer irreparable injury and damages of such a nature that they could not be adequately compensated by an award of monetary damages alone.

88.  The aforesaid acts by defendant are greatly and irreparably damaging Puma and will continue to cause great and irreparable damages to Puma unless enjoined by this Honorable Court.

89.  Because an award of monetary damages cannot fully and adequately compensate Puma for its losses, Puma is without an adequate remedy at law.

## VIII.  FOURTH CLAIM FOR RELIEF
## PRELIMINARY AND PERMANENT INJUNCTION INSTRUCTING DEFENDANT
## TO SURRENDER THE STATION, THE STORE AND THE EQUIPMENT TO PUMA

90.  Paragraphs 1 to 89 are hereby incorporated by reference.

91.  The P.M.P.A. was enacted to protect the franchised retailers ("franchisees") of motor fuel in their relationships with their franchisors and to provide a uniform set of rules to be used throughout the United States.  The statute specifically prohibits the enforcement of state and local laws that differ from it.  *See* 15 U.S.C. § 2806 (1994).

92.  Under the P.M.P.A., the protection of franchisees is achieved by delineating the circumstances under which termination or nonrenewal of the franchise relationship is permissible, and the procedure a franchisor must follow for such termination or nonrenewal.

93.  However, at the same time, Congress also fully recognized the legitimate needs of a franchisor to be able to terminate or not renew a franchise relationship based upon certain actions of the franchisee.

94.  Under the P.M.P.A., 15 U.S.C. § 2802(b) (2) (C), a franchisor, such as Puma, may base a termination and nonrenewal on "the occurrence of an event which is relevant to the

franchise relationship and as a result of which termination or nonrenewal of the franchise relationship is reasonable. . . ." (Emphasis ours).

95.     The P.M.P.A. requires the furnishing of effective written notice to the franchisee of a termination or nonrenewal, at least ninety (90) days prior to the effective date of such termination or nonrenewal, or within any lesser period when, under the circumstances, it would be unreasonable to furnish 90-day notice. *See* 15 U.S.C. § 2804 (1978) (Emphasis ours).

96.     In the present case, on May 20, 2015, Puma became aware of the breaches of contract that CF committed.  Then, on June 12, 2015 **[Exhibit 10]** and again on September 25, 2015 **[Exhibit 12]**, Puma was forced to notify a 90-day termination and subsequently an immediate termination of the franchise relationship established by virtue of the Franchise Agreement in order to avoid further defaults by defendant CF or its illegal assignee, To Go.  The termination was prompted by defendant CF's failure to operate the Station as agreed upon and for transferring its interest in the Station to a third party without Puma's authorization.

97.     Therefore, considering the above detailed facts, Puma's termination of the franchise relationship that existed between it and defendant CF should be declared valid, legal and enforceable, effective as of the termination date, and in compliance with the applicable provisions of the P.M.P.A.

98.     Nonetheless, defendants have refused to surrender the Station and all equipment necessary for the operation of the Station in violation of the P.M.P.A.

99.     Defendant To Go refuses to withdraw all reference to Puma and the Puma Marks from its website.

-20-

100.    Defendants' aforesaid acts have caused Puma to suffer injury and damages of such a nature that could not be adequately compensated by an award of monetary damages alone.

101.    The aforesaid acts by defendants are greatly and irreparably damaging Puma, and will continue to cause great and irreparable damages to Puma unless enjoined by this Honorable Court pursuant to Rule 65 of the Federal Rules of Civil Procedure.

102.    Article 45(b) of the Environmental Public Policy Law ("EPP"), P.R. Laws Ann. tit. 12, § 8004n, specifically defines crude oil and its derivatives as a combustible fuel and a dangerous substance.

103.    Article 46 of the EPP does not exempt from responsibility any party that may be responsible for an oil spill or any other type of dangerous substance. In essence it imposes a type of absolute responsibility, in this case, on Puma. *See* P.R. Laws Ann. tit. 12, § 8004o.

104.    Additionally, Article 45 of the EPP holds responsible any interstate entity that as owner transfers title, possession and the right to use the property to another through lease, license or permit. *See* P.R. Laws Ann. tit. 12, § 8004n (b) (8) (B).

105.    The Regulation No. 4362 of the Control of Underground Storage Tanks of the Commonwealth of Puerto Rico's Environmental Quality Board ("EQB") is also applicable. Pursuant to this regulation, the EQB together with the Environmental Protection Agency, hold responsible the retailer operator, as well as the owner of the USTs or other equipment that causes the fuel spill.

### Irreparable Harm from Exposure to Liability under Environmental Laws

106.   Under applicable federal and state environmental laws, as well as rules and regulations, among others, Puma could be held liable for any damages caused by the unauthorized use of the station and the equipment located therein, which is used to store petroleum products, even though it currently has no control over the station and cannot monitor or control any of Defendants' acts and/or omissions as to the management of hazardous fuel products.

107.   For instance, pursuant to Act No. 416 of September 22, 2004, commonly known as Puerto Rico's Environmental Public Policy Act, Puma may be held liable for any fuel, oil and dangerous substance spill that may occur as a result of it transferring the right to use the station to Defendants.

108.   Additionally, under the Regulation for the Control of Underground Storage Tanks of the Puerto Rico Environmental Quality Board, Puma has a duty to monitor Defendants" compliance with its operation of the underground storage tanks located at the site.

109.   Among the many duties and obligations that the Regulation for the Control of Underground Storage Tanks of the Puerto Rico Environmental Quality Board imposes on Puma are the following: not to cause or allow a spill or release of regulated substances from an UST System into surface or coastal waters of the Commonwealth of Puerto Rico (Rule 935); not to cause or allow the contamination of an existing or potential groundwater source of drinking water (Rule 936); not to cause or allow the installation, operation or closure of an UST System in violation of this Regulation, or other applicable laws or regulations of the Commonwealth of Puerto Rico (Rule 937); not to cause or allow the installation, operation or closure of an UST

System without taking all practicable measures to control fires, explosions, releases and spills, and transport, store, process and dispose regulated substances in such manner, that it do not cause a hazard to health, the environment or public safety (Rule 938).

110.    Puma has no access to the gasoline service station site due to Defendants' refusal to abandon de premises as required under its post termination obligations. Consequently, despite Puma having electronic monitoring of the gasoline that go in the underground tanks, it is still exposed to liability because it cannot properly monitor Defendants' use of the underground tanks or take any physical measures to prevent and avoid dangerous substance spills.

111.    The service station in dispute has three underground storage tanks (10,000 gallons) used to store PUMA branded petroleum products sold by plaintiff to Defendants. Puma last sold petroleum products to Defendants in the first half of 2015. Nonetheless, it is currently unable to verify what inventory of petroleum products remains stored in said tanks or whether non PUMA branded products are being stored in these. Applicable regulations and specific contract provisions require daily inventory record keepings. None of which have been performed for an unknown period of time. Puma is subject to irreparable harm due to the functional limitations of the pumping systems of underground storage tanks (tanks usually retain 500 gallons in their lower parts), Puma's inability to verify existing inventories, the fact that the last delivery of petroleum products is not remote, and its exposure to environmental claims. All along, Puma has no means of control, monitoring or supervision. Has no way of detecting incidents, remediating these and/or reporting incidents to environmental agencies.

112.     Gasoline retailers are ordinarily in charge of the daily operations of service stations. Thus, gasoline wholesalers, such as, Puma, impose contractual duties in order to ensure compliance with the aforementioned provisions governing the use of UST's and avoid environmental liability.

113.     Among the contractual and legal duties expressly demanded from Defendants by Puma regarding the storage and inventory recordkeeping duties required by law are the following: 1) maintenance, repair and replacement of nozzles [Exhibit 2 at Section 7.7.5.III.A]; 2) maintenance, repair and replacement of hose couplings and joints [Id. at 7.7.5.III.A and C]; 3) replacement of the UST's system oil and gasoline filters [Id. at 7.7.5.III.A and E]; 4) daily inspections of tanks water levels [Id. at 7.8.1]; 5) daily inspection, monitoring and recordkeeping of tank fuel levels [Id.]; 6) maintain perpetual inventories of fuel stored in the tanks [Id.]; 7) allow the inspection by Puma and/or government officers of the aforementioned documents [Id. at 8.4]; 8) maintain secured and locked fill caps for the tanks [Id. at 7.8.11 and Schedule D of Exhibit 2 at 2.0(c)].

114.     This is expressly demanded by Puma from Defendants pursuant to the Franchise Agreement. Nonetheless, Puma is unable to correct any environmental situation or report the same as required by the aforementioned regulations.

115.     It is a matter of common knowledge, that when contamination emanates from a gasoline station the potential defendants usually include the oil company that sold and supplied its product to the same. Particularly, when any potential plaintiffs are looking at a site that

displays the PUMA Brand, logo and other trademarks, and to which Puma has supplied fuels in the recent past. Regardless of the merits of such claims and/or the defenses available to Puma.

116.    Because an award of monetary damages cannot fully and adequately compensate Puma for its losses, Puma is without an adequate remedy at law and a preliminary and permanent injunction should be issued by this Honorable Court.

## IX.    FIFTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT

117.    Paragraphs 1 to 116 are hereby incorporated by reference

118.    Under the P.M.P.A., 15 U.S.C. § 2802(b) (2) (C), a franchisor, such as Puma, may base a termination and nonrenewal on "the occurrence of an event which is relevant to the franchise relationship and as a result of which termination or nonrenewal of the franchise relationship is reasonable. . . ." (Emphasis ours).

119.    In the present case, Puma was forced to notify the immediate termination of the franchise relationship with defendant CF in order to avoid further defaults because defendant continued to breach his duty to pay amounts owed to Puma.

120.    Therefore, considering the above detailed facts, this Honorable Court should declare that Puma's termination of the franchise relationship which existed between it and defendant CF was valid, legal and enforceable, effective as of the termination date, and in compliance with the applicable provisions of the P.M.P.A., as authorized by Rule 57 of the Federal Rules of Civil Procedure.

## X.  SIXTH CLAIM FOR RELIEF
## DISPOSSESSION OF PREMISES AND EQUIPMENT

121.     Paragraphs 1 to 120 are hereby incorporated by reference.

122.     Under Article 1459 of the Code, P.R. Laws Ann. tit. 31, § 4066, a lessor may judicially dispossess the lessee for default in full payment of the rental price agreed upon; violation of any of the conditions stipulated in the contract; or failing to use the leased object for the uses or services stipulated in the contract.

123.     Under the above detailed actions by defendant CF and its illegal assignee, To Go, Puma has a right to judicially dispossess defendants from the premises of the Station object of the now terminated franchise relationship established by virtue of the Franchise Agreement.

## XI.  SEVENTH CLAIM FOR RELIEF
## BREACH OF CONTRACT

124.     Paragraphs 1 to 123 are hereby incorporated by reference.

125.     Under Article 1044 of the Code, P.R. Laws Ann. tit. 31, § 2994, "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." The courts may not relieve a party of an obligation to do what it agreed to do by contract, provided said contract is legal, valid, and without defect.

126.     In addition, Puma is entitled to recover damages in an amount not less than $100,000.00 for defendants' breach of the franchise, for subleasing without authority the premises to a third party, unauthorized use of Puma Marks at the Station and at To Go's website,

the for the sale of petroleum products and the underlying contracts, among other violations, which has resulted in Puma's inability to sell its products from the gasoline service station.

## XII.   EIGHTH CLAIM FOR RELIEF
## INDEMNIFICATION AND DAMAGES

127.    Paragraphs 1 to 126 are hereby incorporated by reference.

128.    If Puma is made a party to any lawsuit or any legal action as a result of any act of defendants or as a result of defendants' continued possession of the Station, defendants must indemnify and hold harmless Puma from all expenses, fines, suits, proceedings, claims, losses, damages, liabilities or actions of any kind or nature, including but not limited to, costs and attorneys' fees.

129.    Puma currently has no control of the Station, nor can it monitor any acts and/or omissions by defendants as to the management of hazardous fuel products, for which Puma may be liable under federal and state environmental laws, rules and regulations, among others.

130.    Defendants must be made liable for any expense, cost, loss or damage sustained by Puma as a consequence of any claim made by any person or entity as a result of defendants' deceptive and illegal acts, including but not limited to, gasoline spills, leaks from the tanks, fires, explosions, slip and falls, and the like; damages that the defendant CF has agreed would result in no less than $100,000.00 in damages.

## XIII.   NINTH CLAIM FOR RELIEF
## DAMAGES, ATTORNEYS' FEES, AND EXPENSES

131.    Paragraphs 1 to 130 are hereby incorporated by reference.

132.    As a result of defendants' willful and malicious conduct, Puma is entitled to recover from defendants its damages, and the attorneys' fees and the expenses it has incurred in bringing this action, pursuant to 15 U.S.C. §§ 1114(1) and 1117(a), 15 U.S.C. § 1125(a) and (c), and the Puerto Rico Civil Code.

133.    Since defendant CF, through To Go, has breached its contractual duties in an intentional and willful manner, Puma is entitled to recover any and all damages resulting from said breach, and which include all attorneys' fees to be incurred in prosecuting this case that are estimated in an amount not less than $100,000.00.

**WHEREFORE,** Puma respectfully requests that this Honorable Court enter a temporary restraining order, preliminary and permanent injunction order and a judgment:

1)    Instructing defendants CF and To Go to immediately surrender possession of the Station and all equipment;

2)    Instructing defendants to file with the Court and serve upon Puma, within five (5) days after service on defendants of the temporary restraining order and/or injunction sought, a report in writing and under oath, setting forth in detail the manner and form in which defendants have complied with said order, and a report of any petroleum product sales, if any, since the date of the termination until their surrendering of the premises;

-28-

3) Instructing defendants, their respective agents, servants, employees, representatives, and all others in active concert or participation with them that they are enjoined and restrained during the pendency of this action, and permanently thereafter, from using the PUMA MARKS, altering or covering the PUMA MARKS, promoting or advertising that defendant was formerly a Puma franchisee, using the Puma's operating manuals, training manuals, sales manuals and aids, advertising and promotional materials, and all trade secret, confidential and proprietary material delivered to defendant CF pursuant to the franchise relationship; instructing defendants to stop diluting and tarnishing the PUMA trademark, goodwill, and reputation; instructing defendant to immediately surrender to Puma all stationery, letterheads, forms, manuals, printed material, films, books, cassettes, videotapes, licensed software and advertising containing the PUMA MARKS, including but not limited to, the proprietary mark PUMA;

4) Instructing defendants to immediately stop and refrain from tarnishing, obliterating, and disparaging all PUMA signs at the gasoline service station which contain the PUMA MARKS or other identifying marks;

5) Instructing defendants to immediately stop and refrain from publishing at their respective websites all PUMA MARKS and to stop tarnishing, obliterating, and disparaging all PUMA signs which contain the PUMA MARKS or other identifying marks;

6) Puma also requests that this Honorable Court order a speedy hearing of this action and and advance it on the calendar in accordance with Rule 57 of the Federal Rules of Civil Procedure, in as much as it involves only issues of law on undisputed or relatively undisputed

facts, and that a temporary restraining order be entered instructing defendant to immediately surrender to PUMA the Station and the equipment therein located;

7)    Puma requests that this Honorable Court determine that the termination of the Franchise Agreement between Puma and defendant CF was valid and effective under the provisions of the P.M.P.A.;

8)    That defendants be ordered to compensate Puma for its loss of income in an amount not less than $100,000.00 for the period prior to the termination date that the Station has not sold Puma petroleum products and for the period after the termination date that defendants refused to surrender the Station, and for all damages herein claimed due to non-non-optimized sales volumes and attorneys' fees and other expenses in an amount not less than $100,000.00;

9)    Puma requests the entry of a declaratory judgment whereby defendants are required to indemnify, reimburse and/or compensate Puma for all expenses, losses, damages or liabilities, including but not limited to, costs and attorneys' fees, that Puma sustains or could sustain as a consequence of any act or omission by defendants that may have caused or may cause harm to third parties; and that

10)   Puma be awarded such other and further relief as is just and equitable, and the payment of costs, interest, and attorney fees.

**RESPECTFULLY SUBMITTED,**

In the city of San Juan, Puerto Rico, this 19th day of October, 2015.



*Attorneys for Puma Energy Caribe, LLC*
P. O. Box 9023596
San Juan, Puerto Rico 00902-3596
☎ (787) 977-5050 🖨 (787) 977-5090

S/ALBERTO G. ESTRELLA
**Alberto G. Estrella**
Email: agestrella@estrellallc.com
USDC-PR 209804

S/KENNETH C. SURIA
**Kenneth C. Suria**
Email: kcsuria@estrellallc.com
USDC-PR 213302

## UNSWORN VERIFICATION OF COMPLAINT

I, Víctor M. Domínguez Resto, of legal age, married, General Manager for Puma Energy Caribe, LLC, and a resident of San Juan, Puerto Rico, hereby states under penalty of perjury pursuant to the law of the Law of the United States, 28 U.S.C. §1746, that I have read the foregoing Verified Complaint and based on my knowledge and the documents maintained by the company, the same is true and correct.

In San Juan, Puerto Rico, this 19th day of October, 2016

_____
VÍCTOR M. DOMÍNGUEZ RESTO